# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMY TROTT, individually and on behalf of all others similarly situated,<br><br>                     Plaintiff,<br><br>    v.<br><br>THE FARMER'S DOG, INC.,<br><br>                    Defendant. | Case No. 1:26-cv-03410-ER<br><br>The Honorable Edgardo Ramos |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL ARBITRATION

**JENNER & BLOCK LLP**

Dean N. Panos (*pro hac vice*)
dpanos@jenner.com
353 N. Clark Street
Chicago, IL 60654
Tel.: (312) 923-2765
Fax: (312) 527-0484

Alexander M. Smith (*pro hac vice*)
asmith@jenner.com
2029 Century Park East, Suite 1450
Los Angeles, CA 90067
Tel: (213) 239-5100
Fax: (213) 239-5199

Attorneys for Defendant
The Farmer's Dog, Inc.

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

BACKGROUND ...........................................................................................................................2

I.     TFD Sells Human-Grade Dog Food Personalized for Each Individual Dog. ......................2

II.    Plaintiff's Claims Against TFD. .......................................................................................3

III.   Plaintiff Agreed to Arbitrate Her Claims When She Purchased Food from TFD. ..............4

ARGUMENT .................................................................................................................................6

I.     Plaintiff Assented to the Terms of Use When She Purchased Food from TFD. .................7

II.    The Parties Clearly and Unmistakably Delegated Arbitrability to the Arbitrator. ............11

III.   Even if the Court Were to Reach Plaintiff's Challenges to the Enforceability of
       the Arbitration Provision, Those Challenges Are Meritless. ............................................12

CONCLUSION ............................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aksman v. Greenwich Quantitative Research LP*,
  563 F. Supp. 3d 139 (S.D.N.Y. 2021)......................................................................................12

*Am. Exp. Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013)......................................................................................................................7

*In re Am. Exp. Fin. Advisors Sec. Litig.*,
  672 F.3d 113 (2d Cir. 2011)......................................................................................................7, 11

*Arrigo v. Blue Fish Commodities, Inc.*,
  408 F. App'x 480 (2d Cir. 2011) ...............................................................................................14

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011).....................................................................................................................6, 7

*Bell v. Cendant Corp.*,
  293 F.3d 563 (2d Cir. 2002).......................................................................................................7

*Brooks v. WarnerMedia Direct, LLC*,
  2024 WL 3330305 (S.D.N.Y. July 8, 2024) .............................................................................11

*Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*,
  117 F.3d 655 (2d Cir. 1997).......................................................................................................15

*Castro v. TCA Logistics Corp.*,
  2021 WL 7287305 (E.D.N.Y. Mar. 31, 2021)..........................................................................13

*Davitashvili v. Grubhub, Inc.*,
  131 F.4th 109 (2d Cir. 2025) .....................................................................................................10

*Doctor's Assocs., Inc. v. Stuart*,
  85 F.3d 975 (2d Cir. 1996)..........................................................................................................13

*Doe #1 v. College Bd.*,
  440 F. Supp. 3d 349 (S.D.N.Y. 2020)........................................................................................13

*Edmundson v. Klarna, Inc.*,
  85 F.4th 695 (2d Cir. 2023) .......................................................................................................8, 10

*Epic Sys. Corp. v. Lewis*,
  584 U.S. 497 (2018)......................................................................................................................6, 13

*Epstein Becker & Green, P.C. v. Brown*,
    2010 WL 3835067 (S.D.N.Y. Sept. 10, 2010)........................................................................14

*Gill v. World Inspection Network Int'l, Inc.*,
    2006 WL 2166821 (E.D.N.Y July 31, 2006)........................................................................13

*Gingras v. Think Fin., Inc.*,
    922 F.3d 112 (2d Cir. 2019)........................................................................2, 7, 11

*Hastings v. Nifty Gateway, LLC*,
    724 F. Supp. 3d 241 (S.D.N.Y. 2024)........................................................................9

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
    586 U.S. 63 (2019)........................................................................2, 7, 11

*Kuehn v. Citibank, N.A.*,
    2012 WL 6057941 (S.D.N.Y. Dec. 6, 2012) ........................................................................11

*Maldonado v. NFL*,
    2023 WL 4580417 (S.D.N.Y. July 18, 2023) ........................................................................8

*Merida Capital Partners III LP v. Fernane*,
    2025 WL 2531041 (S.D.N.Y. Sept. 3, 2025)........................................................................15

*Meyer v. Uber Techs., Inc*,
    868 F.3d 66 (2d Cir. 2017)........................................................................1, 8, 9, 10

*Peni v. Daily Harvest, Inc.*,
    2022 WL 16849451 (S.D.N.Y. Nov. 10, 2022)........................................................................9

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
    388 U.S. 395 (1967)........................................................................12, 14

*Rent-A-Ctr. West, Inc. v. Jackson*,
    561 U.S. 63 (2010)........................................................................7, 11

*Schnabel v. Trilegant Corp.*,
    697 F.3d 110 (2d Cir. 2012)........................................................................9, 10

*Specht v. Netscape Commc'ns Corp.*,
    306 F.3d 17 (2d Cir. 2002)........................................................................10

*Thorne v. Square, Inc.*,
    2022 WL 542383 (E.D.N.Y. Feb. 23, 2022)........................................................................9

**Statutes**

9 U.S.C. § 2........................................................................6

## INTRODUCTION

The Farmer's Dog ("TFD") built its business on a simple promise: to help dog people do their best for their dogs.  For over a decade, TFD has delivered on that promise by providing minimally-processed, human-grade meals for dogs that meet all regulatory standards for a nutritionally complete and balanced canine diet.  Yet now, in this putative class action, Plaintiff falsely alleges that TFD formulates its dog food with "excessive levels of fat" that can "trigger severe medical issues in otherwise healthy dogs."  Compl. ¶ 28.  Plaintiff's allegations have no basis in science or fact, and they defy well-accepted principles of veterinary medicine and nutrition.  And it's telling that Plaintiff does not even allege that her dog *ate* TFD's food—let alone that her dog developed any "medical issues" as a result of consuming TFD's food.  But Plaintiff's lawsuit suffers from an equally fundamental flaw: it belongs in arbitration and not in this Court.

When Plaintiff subscribed to TFD's "online subscription service," *id.* ¶ 7, she affirmatively assented to TFD's Terms of Use.  Immediately under the button that Plaintiff selected to initiate her subscription, the website informed her that "[b]y starting the first box, you agree to our **Terms of Use**." Ex. 1.[1] The phrase "Terms of Use" appeared in bold, high-contrast font and contained a hyperlink to TFD's Terms of Use.  As the Second Circuit has made clear, this design more than suffices to "notify the user of the existence of the website's terms of use" and "advise the user that he or she is agreeing to the terms of service when registering or signing up." *Meyer v. Uber Techs., Inc*, 868 F.3d 66, 75–76 (2d Cir. 2017).

The Terms of Use to which Plaintiff assented provide that "any and all federal or state claims based in statute, contract, tort, fraud, or any other legal or equitable theory, as well as any dispute concerning the validity, enforceability, or scope of this agreement to arbitrate . . . shall be

---

[1] All exhibits ("Ex. ___") are attached to the Declaration of Matt Beaumont ("Beaumont Decl."). Unless noted, all citations and internal quotation marks are omitted from case citations.

1

resolved exclusively through final, binding, and individual arbitration, and not in a court of law." Ex. 1 (Terms of Use) § 13.2. They do not allow Plaintiff to sue TFD in court. This Court should hold Plaintiff to her agreement, and it should compel her to arbitrate her claims against TFD.

In her response to TFD's pre-motion letter, Plaintiff argued that the arbitration provision in the Terms of Use is unenforceable. *See* ECF No. 23. But its lack of merit aside, that argument is not for this Court to resolve. The Terms of Use make clear that "any dispute concerning the validity, enforceability, or scope of this agreement to arbitrate . . . shall be resolved exclusively through final, binding, and individual arbitration, and not in a court of law." Terms of Use § 13.2. In other words, the Terms of Use "clearly and unmistakably delegate[] the issue of arbitrability to the arbitrator." *Gingras v. Think Fin., Inc.*, 922 F.3d 112, 126 (2d Cir. 2019). When an arbitration clause contains a delegation provision, as the Terms of Use do here, the "court may not decide the arbitrability issue" and must instead grant the motion to compel arbitration. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019). And even if the Court *were* inclined to entertain Plaintiff's arguments about the enforceability of the arbitration provision, they lack merit.

The only question for this Court to resolve is whether Plaintiff assented to the arbitration clause in TFD's Terms of Use. The answer to that question is yes, and the analysis stops there. This Court should grant this motion and compel Plaintiff to arbitrate her claims against TFD.

## BACKGROUND

### I.  TFD Sells Human-Grade Dog Food Personalized for Each Individual Dog.

For more than half a century, the dominant dog food format was "kibble"—ultra-processed pellets engineered for manufacturing efficiency and long shelf life, often produced with feed-grade rendered ingredients (using high heat and pressure to turn ingredients into a powder), and blended into a slurry with lots of starch. Then, through a process called "extrusion," the slurry is dehydrated using additional high heat and pressure, pushed through industrial machines for shape, and then

2

coated with nutrients and flavor agents.  Although extrusion simplified the mass production of dog food, it subjects the food to extreme processing and allows many kibble companies to use lower-grade animal products, preprocessed ingredients like rendered animal-based powders, and other ingredients unfit for human consumption.

TFD was founded to offer a better alternative.  It set out to improve canine nutrition by offering gently cooked, perishable meals made from ingredients that meet human food standards and are prepared under human food safety protocols.  TFD's recipes are developed by Board-Certified Veterinary Nutritionists® and are 100% complete and balanced under Association of American Feed Control Officials ("AAFCO") guidelines.

While kibble and canned dog food have traditionally been sold in brick and mortar stores, TFD was built on a direct-to-consumer model.  Until earlier this year, every meal sold by TFD was purchased by a consumer signing up for subscription delivery service, with food shipped directly to customers' doorsteps, via TFD's website.  Indeed, Plaintiff admits in her complaint that she purchased TFD's food through TFD's "online subscription service[.]"  *See* Compl. ¶¶ 6, 72.

## II.    Plaintiff's Claims Against TFD.

Plaintiff alleges that TFD formulates its dog food with "excessive levels of fat" that "*could* trigger severe medical issues in otherwise healthy dogs."  *Id*. ¶ 28 (emphasis added).  Plaintiff specifically alleges that the fat content in TFD's dog food "is associated with increased risk of pancreatitis." *Id.* ¶ 65.

To be clear, Plaintiff's allegations are baseless.  Fat is an essential nutrient for dogs.  It supports skin and coat health, strengthens immunity, reduces oxidative stress, and promotes endurance and energy availability.  The levels of fat in TFD's products are in line with AAFCO's guidelines and are consistent with other dog food products historically recommended by

veterinarians. And there is no evidence—either publicly or in Plaintiff's complaint—that the levels of fat in TFD's food promote pancreatitis.

Indeed, Plaintiff does not even allege that her dog ate TFD's food—let alone that her dog developed pancreatitis after eating TFD's food. Rather, Plaintiff claims that her dog "did not like the food and would not eat it," and she admits that TFD provided her with a "partial refund." Compl. ¶ 75. Plaintiff nonetheless alleges that she suffered an economic injury because TFD's alleged misrepresentations about its "dog food's general ability to meet dogs' nutritional needs induced Plaintiff into purchasing the dog food" and "increased the perceived value of [its] dog food to Plaintiff." *Id.* ¶¶ 81–82.

Based on those bare allegations, Plaintiff asserts claims for breach of express warranty (Count I), breach of implied warranty (Count II), common-law fraud (Count III), and violations of the New Hampshire Consumer Protection Act (Count IV). *See* Compl. ¶¶ 97–137. Plaintiff asserts these claims on behalf of a putative class of "[a]ll persons in the United States who purchased Defendant's dog food," as well as a putative New Hampshire subclass. *Id.* ¶ 86.

## III.    Plaintiff Agreed to Arbitrate Her Claims When She Purchased Food from TFD.

As explained above, Plaintiff admits that TFD operates an "online subscription service" through which consumers can purchase TFD's products. Compl. ¶ 6. Plaintiff also admits that she purchased food for her two-year old Labrador Retriever, Mya, through TFD's website in June 2025. *See id.* ¶ 72. TFD's investigation has confirmed that Plaintiff completed this purchase using her Android device on or around June 17, 2025. *See* Beaumont Decl. ¶ 4.

A user who subscribed to TFD's service using an Android device in June 2025, as Plaintiff did, would have seen a checkout page in substantially the following form:

4

*Id.* ¶ 5 & Ex. 1.  To subscribe to TFD's food delivery service, a user clicks the red button that reads "Start first box for [DOG], " which appears directly above clear language stating:

> By starting the first box, you agree to our **Terms of Use**.  The Farmer's Dog is an auto-renewing subscription with no long-term commitment.  You can cancel unprocessed orders anytime.

*Id.* (bold font in original).  The phrase "**Terms of Use**" not only appears in bold, high-contrast font, but also includes a hyperlink to TFD's Terms of Use.  *See* Beaumont Decl. ¶ 6.  In other words, a user cannot purchase TFD's food on its website without agreeing to TFD's Terms of Use.

The version of the Terms of Use to which Plaintiff agreed alerts users in all capital letters, close to the top of the page, that "THESE TERMS CONTAIN A DISPUTE RESOLUTION PROCEDURE AND AN ARBITRATION AGREEMENT (SECTION 13), INCLUDING A WAIVER OF CLASS, REPRESENTATIVE, AND COLLECTIVE ACTIONS, THAT AFFECT

5

YOUR LEGAL RIGHTS, YOUR ABILITY TO GO TO A COURT FOR DISPUTES, AND THE WAYS IN WHICH YOU CAN BRING DISPUTES AGAINST US."

The arbitration provision in turn states that "any or all federal or state law claims based in statute, contract, tort, fraud, or any other legal or equitable theory, as well as any dispute concerning the validity, enforceability, or scope of this agreement to arbitrate . . . shall be resolved exclusively through final, binding, and individual arbitration, and not in a court of law."  Terms of Use § 13.2  The Terms further state that "YOU AND THE FARMER'S DOG EACH EXPRESSLY WAIVE YOUR RIGHT TO GO TO COURT, TO A TRIAL BY JURY, AND TO PARTICIPATE IN A CLASS ACTION, CLASS ARBITRATION, OR OTHER REPRESENTATIVE PROCEEDING WITH RESPECT TO ANY CLAIM SUBJECT TO ARBITRATION."  *Id.* § 13.3.  But instead of abiding by her agreement to engage in "individual arbitration," *id.* § 13.2, Plaintiff chose to file this putative class action in federal court.  TFD now asks this Court to hold Plaintiff to her agreement to arbitrate her dispute with TFD.

## **ARGUMENT**

TFD's Terms of Use provide that the Federal Arbitration Act ("FAA") "governs the interpretation and enforcement of this agreement to arbitrate."  Terms of Use § 13.2.  Under the FAA, an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.

Congress enacted the FAA to replace "widespread judicial hostility to arbitration agreements" with a "liberal federal policy favoring arbitration."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).  "Not only did Congress require courts to respect and enforce agreements to arbitrate, it also specifically directed them to respect and enforce the parties' chosen arbitration procedures."  *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 506 (2018).  By "affording parties discretion in designing arbitration processes," the FAA promotes "efficient, streamlined

6

procedures tailored to the type of dispute." *Concepcion*, 563 U.S. at 344. In other words, the FAA requires courts to "rigorously enforce arbitration agreements according to their terms." *Am. Exp. Co. v. Italian Colors Rest.,* 570 U.S. 228, 233 (2013). This includes delegation clauses, which empower an arbitrator to decide "'gateway' questions of 'arbitrability'" in addition to the merits of the underlying dispute. *Rent-A-Ctr. West, Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010).

"In deciding whether claims are subject to arbitration, a court must consider (1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011). If the answer to the first question is yes, however, a court must determine "whether the issue of arbitrability is for the court or for the arbitrator." *Bell v. Cendant Corp.*, 293 F.3d 563, 565 (2d Cir. 2002). This requires a limited inquiry into whether the agreement "'clearly and unmistakably' delegates the issue of arbitrability to the arbitrator." *Gingras*, 922 F.3d at 126. If the agreement does so, the "court may not decide the arbitrability issue" and must instead reserve that issue for the arbitrator. *Henry Schein*, 586 U.S. at 69.

As explained below, Plaintiff agreed to arbitrate her claims against TFD when she purchased dog food through TFD's website, which informed her that she must "agree to our Terms of Use" in order to subscribe to delivery through TFD. Ex. 1. Because the arbitration provision in the Terms of Use clearly and unmistakably delegates questions about arbitrability to the arbitrator, this Court need not—and should not—entertain Plaintiff's arguments that the arbitration provision is unenforceable. But even if the Court were to reach those arguments, they are wrong.

I.      **Plaintiff Assented to the Terms of Use When She Purchased Food from TFD.**

To assess whether Plaintiff assented to TFD's Terms of Use, this Court asks whether: (1) "a reasonably prudent person would be on inquiry notice of the [T]erms"; and (2) whether Plaintiff "unambiguously manifest[ed] consent through conduct that a reasonable person would understand

7

to constitute assent." *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 703 (2d Cir. 2023) (emphasis omitted).  The answer to both questions is yes.

In analyzing "web-based contract[s]," courts consider "the design and content of the relevant interface to determine if the contract terms were presented to the offeree in a way that would put [the offeree] on inquiry notice of such terms." *Maldonado v. NFL*, 2023 WL 4580417, at *2 (S.D.N.Y. July 18, 2023).  "[M]ultiple factors" are relevant, including whether "the screen is cluttered"; whether "the text and hyperlinks to the [Terms] are positioned directly below the relevant assent button"; and whether "the hyperlinks are contrasted with the background."  *Id.* at *2.  "Courts around the country have recognized that [an] electronic 'click' can suffice to signify the acceptance of a contract [if] the layout and language of the site give the user reasonable notice that a click will manifest assent to an agreement."  *Meyer*, 868 F.3d at 75.

*Meyer* dictates the outcome here.  There, the plaintiff brought a putative class action against Uber, and Uber moved to compel arbitration based on the arbitration provision in its Terms of Service.  868 F.3d at 70.  The district court denied Uber's motion to compel arbitration and found that the plaintiff "did not have reasonably conspicuous notice of and did not unambiguously manifest assent to Uber's Terms of Service when he registered."  *Id.*  The Second Circuit reversed.

In so holding, the Second Circuit first found that "the design of the screen and language used rendered the notice provided reasonable."  *Id.* at 78.  It emphasized that the payment screen was "uncluttered," that it advised users that "[b]y creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY," and that this "text, including the hyperlinks to the Terms and Conditions and Privacy Policy, appears directly below the buttons for registration."  *Id.*  It also noted that "[t]he entire screen is visible at once," that "the user does not need to scroll beyond what is immediately visible to find notice of the Terms of Service," that the "dark print"

8

of the text "contrasts with the bright white background," and that "the hyperlinks are in blue and underlined."  *Id.*  And because "notice of the Terms of Service is provided simultaneously to enrollment," the court found that "a reasonably prudent smartphone user would understand that the terms were connected to the creation of a user account."  *Id.*

In light of the design of the signup page, the Second Circuit found that the plaintiff's manifestation of assent to the Terms of Service "was unambiguous in light of the objectively reasonable notice of the terms."  *Id.*  As the court explained, "there is ample evidence that a reasonable user would be on inquiry notice of the terms, and the spatial and temporal coupling of the terms with the registration button 'indicate[d] to the consumer that he or she is . . . employing such services subject to additional terms and conditions that may one day affect him or her.'"  *Id.* (quoting *Schnabel v. Trilegant Corp.*, 697 F.3d 110, 127 (2d Cir. 2012)).  As a result, a "reasonable user would know that by clicking the registration button, he was agreeing to the terms and conditions accessible via the hyperlink, whether he clicked on the hyperlink or not."  *Id.* at 79–80.

TFD's signup page is identical in all relevant respects to the one in *Meyer*, and courts routinely compel arbitration in similar circumstances.[2]  Like the signup page in *Meyer*, TFD's signup page apprises users that, "[b]y starting the first box, you agree to our **Terms of Use**."  Ex. 1 (bold font in original).  Just as in *Meyer*, the phrase "Terms of Use" appears in bold, high-contrast font and contains a hyperlink to the Terms of Use.  *See id.*  As in *Meyer*, the signup page is "uncluttered" and contains only a single line of text between the signup button and the admonition

---

[2] *See, e.g.*, *Hastings v. Nifty Gateway, LLC*, 724 F. Supp. 3d 241, 249 (S.D.N.Y. 2024) ("Like the registration page in *Meyer*, Nifty Gateway's sign-up page contains reasonably conspicuous notice of the arbitration agreement."); *Thorne v. Square, Inc.*, 2022 WL 542383, at \*11 (E.D.N.Y. Feb. 23, 2022) (granting motion to compel arbitration and finding *Meyer* "instructive" in "determining whether Plaintiffs manifested assent to the General Terms of Service and arbitration provision therein" by accessing "Cash App's sign-up flow"); *Peni v. Daily Harvest, Inc.*, 2022 WL 16849451, at \*4 (S.D.N.Y. Nov. 10, 2022) (similar).

that a user must agree to the Terms of Use to start a subscription. *Meyer*, 868 F.3d at 79; *see* Ex. 1.[3]  And the disclosure of the Terms of Use appears on the page that a user must complete to start his or her TFD subscription, which provides the same "spatial and temporal coupling" that would lead a user to understand that he or she was agreeing to be bound by TFD's Terms of Use. *Meyer*, 868 F.3d at 79; *see also Schnabel*, 697 F.3d at 127.

Those features put Plaintiff "on inquiry notice" of the Terms of Use when she subscribed to delivery from TFD. *Edmundson*, 85 F.4th at 704 ("A reasonably prudent internet or smartphone user is on inquiry notice of contractual terms where the terms are presented in a clear and conspicuous way.").  Plaintiff is therefore bound by those Terms—including the arbitration provision.

It is irrelevant, as Plaintiff mentioned in her pre-motion letter, ECF No. 23, at 1, that the checkout page does not include a checkbox that a user must select.  What matters instead is "whether a reasonably prudent user would understand his or her contact to constitute assent to those terms." *Edmundson*, 85 F.4th at 704.  And the Second Circuit has repeatedly made clear that a website need not include a checkbox for a user to manifest assent to an arbitration provision. *See id.* at 707–08 (finding that the plaintiff unambiguously manifested assent to the defendant's terms of use by clicking on the "Confirm and continue" button on the defendant's payment widget); *Davitashvili v. Grubhub, Inc.*, 131 F.4th 109, 116–17 (2d Cir. 2025) (finding that a user manifested

---

[3] In her response to TFD's pre-motion letter, Plaintiff asserted that the language apprising a user of her assent to the Terms of Use appeared in a place that a user might not see unless he or she affirmatively scrolled to the bottom of the page. *See* ECF No. 23, at 2 (citing *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 30 (2d Cir. 2002)).  But the screenshot Plaintiff attached to her response, ECF No. 23-2, is from a desktop browser—not from the Android interface that Plaintiff used when she subscribed to delivery through TFD's website. *See* Beaumont Decl. ¶ 4 & Ex. 1.

assent to the defendant's terms of use when the website advised the user that "By placing your order, you agree" to the terms of use).

Here too, TFD's website informs users—including Plaintiff—that "[b]y starting your first box, you agree to our Terms of Use."  Ex. 1.  By clicking the button that states "Start first box," Plaintiff unambiguously manifested her assent to the Terms of Use.  *See Brooks v. WarnerMedia Direct, LLC*, 2024 WL 3330305, at *14 (S.D.N.Y. July 8, 2024) (finding that "clicking the 'Start Streaming' button *does* constitute unambiguous assent" to arbitrate where the defendant's terms of use stated that, "[b]y clicking 'Start Streaming, you agree to the" terms) (emphasis in original).  Plaintiff therefore agreed to those Terms, which require her to arbitrate her claims against TFD.

## II.    The Parties Clearly and Unmistakably Delegated Arbitrability to the Arbitrator.

Once this Court determines that "the parties have entered into a valid agreement to arbitrate," the only remaining question is "whether the dispute at issue comes within the scope of the arbitration agreement."  *In re Am. Exp.*, 672 F.3d at 128.  But before it answers that question, the Court must first determine whether the agreement "'clearly and unmistakably' delegates the issue of arbitrability to the arbitrator."  *Gingras*, 922 F.3d at 126 (quoting *Jackson*, 561 U.S. at 69).  "[I]f a valid agreement exists, and the agreement delegates the arbitrability issue to the arbitrator, a court may not decide the arbitrability issue."  *Henry Schein*, 586 U.S. at 69.

Here, the Terms of Use require an arbitrator to resolve "any dispute concerning the validity, enforceability, or scope of this agreement to arbitrate."  Terms of Use § 13.2.  By its own terms, this language clearly and unmistakably delegates to the arbitrator the power to decide whether the arbitration provision in the Terms of Use is valid or enforceable.  And as courts routinely hold, a delegation provision like the one in TFD's Terms of Use prohibits a court from determining whether the "[a]greement as a whole" is unconscionable or otherwise unenforceable.  *Jackson*, 561 U.S. at 72; *see also, e.g.*, *Kuehn v. Citibank, N.A.*, 2012 WL 6057941, at *3 (S.D.N.Y. Dec.

11

6, 2012) ("[I]n light of a delegation agreement, a party's challenge to the arbitration agreement on unconscionability grounds is a dispute that must be resolved by arbitration unless the party opposing arbitration demonstrates that the delegation agreement itself is unenforceable.").

That principle applies with equal force to Plaintiff's argument that the arbitration agreement was induced by fraud. *See* ECF No. 23. Because this argument bears on the validity of the arbitration agreement as a whole, it is for the arbitrator to decide. *See, e.g.*, *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967) (holding that the FAA "does not permit the federal court to consider claims of fraud in the inducement of the contract generally"); *Aksman v. Greenwich Quantitative Research LP*, 563 F. Supp. 3d 139, 154 (S.D.N.Y. 2021) ("Arguments that are directed at the whole contract containing the agreement to arbitrate—*i.e.*, that the entire agreement is void or has terminated—are for the arbitrator to decide."). Accordingly, even if Plaintiff maintains that she was fraudulently induced to enter into the Terms of Use (which she was not), that issue is for the arbitrator to decide—not this Court.

III.    **Even If the Court Were to Reach Plaintiff's Challenges to the Enforceability of the Arbitration Provision, Those Challenges Are Meritless.**

In her response to TFD's pre-motion letter, Plaintiff argued that TFD's arbitration provision "contains numerous one-sided, restrictive, burdensome, and oppressive terms that render the entire arbitration provision unconscionable and unenforceable." ECF No. 23, at 2. As explained above, the arbitration provision in the Terms of Use requires an arbitrator—and not this Court—to resolve those challenges in the first instance. *See supra* § II. But even if the Court *were* to reach Plaintiff's challenges to the arbitration provision, they are uniformly meritless.

**Location of the Arbitration**.    Plaintiff argued that the arbitration provision is unenforceable because it requires "[a]ny arbitration hearings [to] be held in New York City, which is likely prohibitively expensive for most customers." ECF No. 23, at 2. It is not clear how

Plaintiff could claim that this language renders the arbitration provision unenforceable in light of her decision to file this lawsuit in the Southern District of New York, even though she lives in New Hampshire.  In any event, the Second Circuit has made clear that an arbitration agreement is not unenforceable simply because it specifies a particular location for arbitration.  *See Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 980 (2d Cir. 1996) (rejecting the defendants' assertion that an arbitration provision was unenforceable because it required arbitration in Florida or Connecticut); *Gill v. World Inspection Network Int'l, Inc.*, 2006 WL 2166821, at *3 (E.D.N.Y July 31, 2006) ("As a general matter, courts consistently enforce arbitral forum selection clauses under the FAA's presumption requirement that arbitration clauses are fully enforceable.").

**Individual Arbitration.**  Plaintiff also challenged the arbitration provision on the grounds that it requires individual arbitration, prohibits "class or collective actions," and does not permit the arbitrator to "consolidate or coordinate claims."  ECF No. 23, at 2–3.  But the Supreme Court has made clear that individualized adjudication is "one of arbitration's fundamental attributes" and has rejected the proposition that arbitration agreements are unenforceable "because they require individualized arbitration proceedings instead of class or collective ones."  *Epic*, 584 U.S. at 508; *see Castro v. TCA Logistics Corp.*, 2021 WL 7287305, at *7 (E.D.N.Y. Mar. 31, 2021) ("*In Epic*, the United States Supreme Court held that the FAA contains an explicit congressional directive that arbitration agreements providing for individualized proceedings must be enforced . . . .").

**Fees.**  Plaintiff then argued that the arbitration provision is unconscionable because "[e]ach party is responsible for paying its share of any fees assessed by the arbitration provider and arbitrator."  ECF No. 23, at 3.  But the fact that an arbitration provision "provides that each party is responsible for its own fees and expenses incurred in connection with the arbitration, regardless of outcome, is . . . insufficient to render it substantively unconscionable."  *Doe #1 v. College Bd.*,

13

440 F. Supp. 3d 349, 357 (S.D.N.Y. 2020); *see also Epstein Becker & Green, P.C. v. Brown*, 2010 WL 3835067, at *3 (S.D.N.Y. Sept. 10, 2010) (applying New York law and rejecting challenge to arbitration provision requiring the parties to share the costs and expenses of arbitration).

**Temporal Scope.**  Plaintiff next argued that the arbitration agreement is unenforceable because it applies to claims that arose before a consumer initiated her subscription to TFD's dog food or that arose after a consumer cancelled her subscription to TFD's dog food.  *See* ECF No. 23, at 3.  But Plaintiff cannot argue that this renders *her* agreement to arbitrate unenforceable, as her claims arise out of her purchase of dog food from TFD *after* she initiated her subscription. Moreover, courts throughout the Second Circuit have held that arbitration provisions can validly apply to disputes arising at any time, so long as "nothing in the arbitration provision places a temporal limitation on arbitrability." *Arrigo v. Blue Fish Commodities, Inc.*, 408 F. App'x 480, 481–82 (2d Cir. 2011); *see also, e.g.*, *Agarunova v. Stella Orton Home Care Agency, Inc.*, 2019 WL 13167221, at *4 (E.D.N.Y. Dec. 1, 2019) (enforcing arbitration agreement that "contain[ed] no explicit temporal limitation" on arbitrability and collecting cases reaching similar conclusions). Here too, the absence of any temporal limitation in TFD's arbitration provision has no bearing on whether it is unenforceable or unconscionable.

**Fraud.**  Finally, Plaintiff argued that the arbitration agreement is unenforceable because it "applies to claims for fraud."  But to the extent Plaintiff asserts that her agreement to arbitrate was procured by fraud, that is an issue for the arbitrator to decide.  *See supra* § II; *Prima Paint*, 388 U.S. at 403–04.  And to the extent Plaintiff asserts that the arbitration provision is unenforceable simply because it requires her to arbitrate claims that sound in fraud, that argument is meritless.

By its own terms, the arbitration provision in TFD's Terms of Use applies to "any and all claims, disputes, or controversies that have arisen or may arise between you and us, including

14

without limitation any and all federal or state claims based in statute, contract, tort, *fraud*, or any other legal or equitable theory." Terms of Use § 13.2 (emphasis added). As the Second Circuit has recognized, a plaintiff cannot "transform a general fraud claim into fraud in the inducement of the arbitration clause merely by stating that the arbitration clause is an element of the scheme to defraud." *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 667 (2d Cir. 1997). Absent any specific argument that Plaintiff was "deceived as to the nature, scope, or provisions of the arbitration clause," as opposed to TFD's products more generally, the fact that the arbitration provision applies to claims for fraud does not render it unenforceable. *Merida Capital Partners III LP v. Fernane*, 2025 WL 2531041, at *5 (S.D.N.Y. Sept. 3, 2025).

## CONCLUSION

In subscribing to TFD's food delivery service, Plaintiff agreed to arbitrate any claims she might bring against the company. This Court should hold Plaintiff to that agreement, and it should compel her to arbitrate her claims against TFD.

Dated: July 23, 2026                                Respectfully submitted,

JENNER & BLOCK LLP

By: /s/ Dean N. Panos
       Dean N. Panos (*pro hac vice*)
       Alexander M. Smith (*pro hac vice*)

Attorneys for Defendant
The Farmer's Dog, Inc.

15

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing document was filed on July 23, 2026 with the Clerk of the Court by using the CM/ECF system, which will effect electronic service on all parties and attorneys registered to receive notifications via the CM/ECF system.

Dated:  July 23, 2026                    By: _____ /s/ Dean N. Panos _____
                                                          Dean N. Panos