UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMY TROTT, *individually and on behalf of all others similarly situated*,

Plaintiff,

*– against –*

THE FARMER'S DOG, INC.,

Defendant.

**OPINION & ORDER**

26-cv-03410 (ER)

RAMOS, D.J.:

Amy Trott ("Trott"), individually and on behalf of all others similarly situated (the "Class"), brings this action against The Farmer's Dog, Inc. ("TFD"), alleging that TFD defrauded customers by misleadingly advertising that its dog food is healthy and safe for dogs, when in fact, it is dangerous for dogs. Doc. 1 ¶¶ 8, 31, 39–40, 44–50. Pending before the Court is TFD's motion to compel arbitration pursuant to the arbitration clause in TFD's Terms of Service (the "Terms"). Doc. 26. For the reasons set forth below, the motion is GRANTED.

## I. BACKGROUND

### A. Factual History

TFD is a dog food company that sells perishable food made from human-grade ingredients. Doc. 27 at 7. Its recipes are developed by "Board Certified Veterinary Nutritionists" and adhere to the Association of American Feed Control Officials guidelines. Doc. 1 ¶ 2. TFD sells its products through a subscription delivery service. *Id.* ¶ 75. TFD is a Delaware corporation with a principal place of business in New York. *Id.* ¶ 2.

After seeing a Facebook advertisement for TFD, Trott purchased a fourteen-day subscription on her Android phone in New Hampshire on June 17, 2025. *Id.* ¶¶ 71–72, 74, 86; Doc. 28 ¶ 4; Doc. 27 at 8. Trott's dog refused to eat the food, so TFD gave Trott a partial refund of $9. Doc. 1 ¶ 75.

When Trott purchased her TFD subscription, the checkout page on her Android phone displayed a large button that said, "Start first box" that she had to click to complete the order. Doc. 27 at 9, 13; Doc. 29 at 7. The words "Start first box" contrasted with the background color of the button—if Trott's phone was on "dark theme" the "Start first box" button would have been red, and if her phone was on the default "light theme" the button would be orange. Doc. 30 at 10.

Directly below the "Start first box" button was more text. Doc. 27 at 9. The text was in dark font contrasting with a light background, or in light text, contrasting with a dark background, depending on whether the phone was in "dark theme" or not. Doc. 30 at 10. The first line of text below the button read, "Pause or cancel anytime from your account." Doc. 27 at 13. Directly below that, there were three lines of text that began, "By starting the first box, you agree to our Terms of Use." *Id.* "Terms of Use" was a hyperlink in bold font that led to a website containing TFD's Terms. *Id.*

TFD's Terms note that:

> THESE TERMS CONTAIN A DISPUTE RESOLUTION PROCEDURE AND AN ARBITRATION AGREEMENT (SECTION 13), INCLUDING A WAIVER OF CLASS, REPRESENTATIVE, AND COLLECTIVE ACTIONS, THAT AFFECT YOUR LEGAL RIGHTS, YOUR ABILITY TO GO TO A COURT FOR DISPUTES, AND THE WAYS IN WHICH YOU CAN BRING DISPUTES AGAINST US.

Doc. 28-2 at 2. Section 13 of the Terms (the "Arbitration Clause") states that the Terms are governed by the Federal Arbitration Act ("FAA") and provides further details about the arbitration procedures required, like engaging in a mandatory pre-dispute resolution process, waiver of class action, and an agreement to arbitrate in New York with the American Arbitration Association ("AAA"). *Id.* at 21–23. Section 13.2 of the Terms states that "any and all claims, disputes, or controversies . . . as well as any dispute concerning the validity, enforceability, or scope of this agreement to arbitrate [] shall be resolved

exclusively through final, binding, and individual arbitration, and not in a court of law." *Id.* at 21.

### B. Procedural History

Trott filed the complaint on behalf of herself and the Class on April 24, 2026. Doc. 1. Trott asserts claims for breach of express warranty, breach of implied warranty, fraud, and violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.* Doc. 1 ¶¶ 97–137. Trott alleges that TFD "adds excessive amounts of fat to its dog food," which puts dogs at a substantially higher risk of acute pancreatitis. Doc. 28-2 ¶¶ 54, 56. She also alleges that TFD was on notice that its food was highly fatty and posed serious health risks to dogs but still misrepresented and concealed the nutritional value of its food to customers. Doc. 1 ¶¶ 64, 81. Trott also alleges that TFD intended that Trott would rely on its marketing and recommendations that TFD's food was safe and met dogs' nutritional needs. *Id.* ¶ 77. TFD filed a motion to compel arbitration on July 23, 2026. Doc. 27. Trott filed her opposition on August 20, 2026. Doc. 29. TFD filed a reply on August 28, 2026. Doc 30.

## II. LEGAL STANDARD

Pursuant to the FAA, "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. The FAA reflects "a liberal federal policy favoring arbitration agreements." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983)). "Arbitration is a matter of contract" and courts should place arbitration agreements on an equal footing with other contracts. *Id.* at 339 (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)). Arbitration agreements should be enforced according to their terms. *Id.* (citing *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468, 478 (1989)). But parties are not required to arbitrate unless they agree to do so. *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 73

(2d Cir. 2017). Thus, before an agreement to arbitrate can be enforced, the court must first determine whether an agreement to arbitrate exists. *Id.* This question is determined by state contract law principles. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016).

Once a court has determined that the parties agreed to contract, it must determine "whether the dispute at issue comes within the scope of the arbitration agreement." *In re American Express Financial Advisors Securities Litigation*, 672 F.3d 113, 128 (2d Cir. 2011). "[T]o the extent there is doubt about the scope of arbitrable issues, the Court must resolve that doubt in favor of arbitration." *Lai Chan v. Chinese-American Planning Council Home Attendant Program, Inc.*, 180 F. Supp. 3d 236, 241 (S.D.N.Y. 2016) (citing *Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444, 452–53 (2003)). An arbitration agreement may also contain a delegation clause, which is "an agreement to arbitrate threshold issues concerning the arbitration agreement. Parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center*, 561 U.S. at 68–69.

To form a contract, there must be a mutual manifestation of assent with respect to all material terms. *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288–89 (2d Cir. 2019). "Arbitration under the [FAA] is a matter of consent, not coercion." *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 369 (2d Cir. 2003) (quoting *Volt*, 489 U.S. at 479). Thus, though the presumption in favor of arbitration is strong, the parties must actually agree to arbitrate before the court will order them to arbitrate a dispute. *Id.* For contracts formed online, "where there is no evidence that an internet or app user had actual knowledge of the contractual terms, the user will still be bound if (1) a reasonably prudent user would be on inquiry notice of the terms, and (2) the user unambiguously manifests assent through . . . conduct that a reasonable person would understand to constitute assent." *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 703 (2d Cir. 2023) (citation omitted); *Meyer*, 868

F.3d at 75 ("Whether a reasonably prudent user would be on inquiry notice turns on the '[c]larity and conspicuousness of arbitration terms.'") (citing *Specht v. Netscape Communications Corp.*, 306 F.3d 17, 30 (2d Cir. 2002)). "[O]n a motion to compel arbitration, [the court] may determine that an agreement to arbitrate exists where the notice of the arbitration provision was reasonably conspicuous and manifestation of assent unambiguous as a matter of law." *Meyer*, 868 F.3d at 76. "Like other contracts, arbitration agreements 'may be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability.'" *Simmons v. SUNco Capital, LLC*, No. 24 Civ. 7129 (BMC), 2025 WL 711724, at *3 (E.D.N.Y. Mar. 5, 2025) (citation omitted) (quoting *Rent-A-Center*, 561 U.S. at 68).

In the context of motions to compel arbitration, allegations related to the question of whether the parties formed a valid arbitration agreement are evaluated to determine whether they raise a genuine issue of material fact. *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012); *see also Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) ("In the context of motions to compel arbitration brought under the [FAA], the court applies a standard similar to that applicable for a motion for summary judgment. If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary."). On a motion for summary judgment, the court considers "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits," and draws "all reasonable inferences in favor of the non-moving party." *Meyer*, 868 F.3d at 74 (citation omitted).

The party seeking to compel arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made. *Zachman v. Hudson Valley Federal Credit Union*, 49 F.4th 95, 101–02 (2d Cir. 2022). "Once the existence of an agreement to arbitrate is established, the burden shifts to the party seeking to avoid arbitration to show [] the agreement to be inapplicable or invalid." *Id.* at 102 (citation omitted); *see also Doctor's Associates, Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019) ("An agreement that has

not been properly formed is not merely an unenforceable contract; it is not a contract at all.”).

If the Court concludes that the parties agreed to arbitrate, “it should then consider whether the dispute falls within the scope of the arbitration agreement.” *Meyer*, 868 F.3d at 74 (quoting *Specht*, 306 F.3d at 26). If the dispute falls within the scope of the arbitration agreement, the “role of the court ends and the matter is one for arbitration.” *Unique Woodworking, Inc. v. N.Y.C. District Council of Carpenters’ Pension Fund*, No. 7 Civ. 1951 (WCC), 2007 WL 4267632, at *4 (S.D.N.Y. Nov. 30, 2007).

## III. DISCUSSION

### A. Trott Agreed to TFD’s Terms and They Were Presented in a Reasonably Conspicuous Manner

TFD argues that Trott is bound to arbitrate her claims because she had notice of the Terms and manifested her assent to them by completing her purchase of the TFD subscription. Doc. 27 at 12. Trott asserts that she did not have notice of the Terms, therefore there was no mutual assent and she is not bound by the Terms. Doc. 29 at 10, 11. Terms communicated via hyperlink when a user signs up for an account or completes a purchase, known as “sign-in wrap,” do not require affirmative assent by the user, so the court must inquire whether she was on inquiry notice of the terms, which is sufficient to bind users to terms. *See Meyer*, 868 F.3d at 75–76. To assess whether a user had inquiry notice of the terms, the court must consider the point of view of a reasonably prudent smartphone user. *Id.* at 77. This Circuit has held that a reasonably prudent smartphone user knows that underlined text highlighted in blue indicates a hyperlink that will lead the user to another page with further information. *Id.* at 77–78. When a reasonably prudent user signs up for an account with terms communicated via sign-in wrap, the user manifests assent to the terms by proceeding with account creation or purchase, regardless of whether the user clicks on and reviews the terms. *Id.* at 79–80.

Relying on *Meyer*, Trott argues that the fatal flaw of TFD's checkout page is that the entire screen is not visible at once and users must scroll down to see the hyperlink to the Terms. Doc. 29 at 8–9. Since the Terms were not immediately visible to her when she made her purchase, Trott argues that she was not on inquiry notice of the Terms and cannot be bound to arbitrate her claims. *Id.* at 12–13. Specifically, Trott asserts she is not bound by the Terms because: (1) the hyperlink was in smaller text than the purchase button; (2) the hyperlink was not in black text; (3) the hyperlink font was fainter than that of the purchase button; and (4) Trott was not required to check a box indicating her agreement to the Terms. *Id.*

Analyzing web-based contracts is a fact-intensive, objective process. *Edmundson*, 85 F.4th at 703. "There are infinite ways to design a website," and there is no set list of "particular features that *must* be present to satisfy the reasonably conspicuous standard." *Meyer*, 868 F.3d at 75; *Soliman v. Subway Franchisee Advertisement Fund Trust, Ltd.*, 999 F.3d 828, 842 (2d Cir. 2021) (emphasis added). The presence or lack of any particular element does not automatically determine whether the terms are reasonably conspicuous. *See Edmundson*, 85 F.4th at 707. For example, even if terms are only communicated via hyperlink and do not require a user to check a box noting they agree, reasonable notice may still be found. *See Meyer*, 868 F.3d at 78 (holding that terms communicated via hyperlink which did not require user to check a box provided reasonable notice). The location of hyperlinked terms on a webpage alone does not determine whether they are reasonably conspicuous either. *Nicosia*, 834 F.3d at 237 ("Proximity to the top of a webpage does not necessarily make something more likely to be read" if the website is overly elaborate and complex). Rather, the "totality of the circumstances" should be taken into consideration. *Edmundson*, 85 F.4th at 707.

In determining reasonably conspicuous notice, the court may consider factors such as whether: the screen is uncluttered; the entire screen is visible and user need not scroll beyond what is immediately visible; the text contrasts with background; and hyperlinks are

blue and underlined, and temporally and spatially coupled. *Meyer*, 868 F.3d at 78. Also, "'[s]ignificant weight' [is given] to hyperlinked terms 'temporally coupled with [a] register button,' because (1) 'that meant that the user could not avoid noticing the hyperlink when she registered for an account,' and (2) 'importantly, that also allowed the plaintiff to review the [t]erms of [s]ervice prior to registration.'" *Thorne v. Square, Inc.*, No. 20 Civ. 5119 (NGG) (TAM), 2022 WL 542383, at *8 (E.D.N.Y. Feb. 23, 2022) (quoting *Starke*, 913 F.3d at 294)); *see also Schnabel*, 697 F.3d at 127 (presenting terms "at a place and time that the consumer will associate with the initial purchase . . . at least indicates to the consumer that he or she is taking such goods . . . subject to additional terms and conditions that may one day affect him or her"). Even if a website has "some deficiencies," that does not mean it is impossible for it to provide reasonably conspicuous notice. *See e.g.*, *Edmundson*, 85 F.4th at 706–07 (finding that a hyperlink to terms in small, non-blue font provided reasonably conspicuous notice to users); *see also Baugus v. Event Tickets Center, Inc.*, No. 24 Civ. 9552 (GHW) (GS), 2026 WL 866840, at *15 (S.D.N.Y. Mar. 30, 2026) ("That the user must scroll down to reach the terms does not cut against a finding of conspicuousness.").

Taking into consideration the totality of the circumstances, TFD's checkout page provided reasonably conspicuous notice of the Terms. *Edmundson*, 85 F.4th at 707. TFD's checkout webpage configuration is different in key ways from other websites the Second Circuit has held did not provide reasonably conspicuous notice. TFD's checkout page is not cluttered, the hyperlink is temporally and spatially coupled with purchase, the hyperlink is bolded and contrasts with the background, and there is only one line of text separating the "Start first box" button and a hyperlink to the Terms. *See* Doc. 27 at 9. The hyperlink was not "buried" in a wordy, fine-print paragraph that did not contrast with the surrounding text, like in *Soliman*, 999 F.3d at 835.

Although TFD's Terms may not have been immediately visible to Trott at checkout without scrolling, they were not located in "obscure sections" of the website, as Trott

suggests. *Nicosia*, 834 F.3d at 233, 237 (holding that terms hidden in "obscure sections of a webpage" among numerous links in various fonts colors and locations did not provide reasonably conspicuous notice to user). The screenshot included in Trott's memorandum in opposition also shows some text cut off at the bottom of the screen. Doc 29 at 8. TFD asserts this suggests that there is more text to be read below by scrolling down. Doc 30 at 7–8. Regardless, as mentioned, TFD's terms were located very close to the "Start first box button." *See* Doc. 27 at 9; *cf. Specht*, 306 F.3d at 20, 30 (holding that terms hidden at the bottom of the screen not visible without scrolling, with no indication to the user to scroll down did not provide reasonably conspicuous notice). Since the Terms were reasonably conspicuous, Trott was on inquiry notice of them. By proceeding with her purchase of TFD subscription, Trott therefore agreed to TFD's Terms and is bound by them.

### B. Trott Cannot Transform a General Fraud Claim into Fraudulent Inducement of the Contract

Trott argues that even if the Court finds that she assented to the Terms when she purchased a subscription, the Terms do not bind the parties because they were fraudulently induced. Doc. 29 at 15. Specifically, Trott asserts that because she was defrauded into purchasing TFD's food, assent to the Arbitration Clause was also induced by fraud. *Id.* at 16. TFD asserts that whether or not the agreement was induced by fraud is for the arbitrator to decide pursuant to the delegation clause. Doc. 27 at 11–12.

"There are two types of validity challenges under § 2 [of the FAA]: 'One type challenges the validity of the agreement to arbitrate,' and '[t]he other challenges the contract as a whole . . . (*e.g.*, the agreement was fraudulently induced).'" *Rent-A-Center*, 561 U.S. at 70 (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006)). If an arbitration provision is found to be invalid, it is severable from the remainder of the contract. *Buckeye Check Cashing*, 546 U.S. at 445. Further, "[a] party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate." *Rent-A-Center*, 561 U.S. at 70.

The Court cannot "consider claims of fraud in the inducement of the contract generally" where there is no specific challenge to the Arbitration Clause itself being fraudulent. *Prima Paint Corp. v. Flood & Conklin Manufacturing. Co.*, 388 U.S. 395, 404 (1967). "[E]ven . . . where the alleged fraud that induced the whole contract equally induced the agreement to arbitrate which was part of that contract—we nonetheless require the basis of challenge to be directed specifically to the agreement to arbitrate before the court will intervene." *Rent-A-Center*, 561 U.S. at 71. "[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Buckeye Check Cashing*, 546 U.S. at 445–46.

Trott does not make a specific allegation that the Arbitration Clause itself was induced by fraud. *See* Doc. 29 at 15–16. She alleges that since TFD fraudulently induced her to purchase a subscription by claiming that its dog food is healthy and safe, she was also defrauded into agreeing to its Terms. *Id.* at 15. However, a party may not "transform a general fraud claim into fraud in the inducement of the arbitration clause merely by stating that the arbitration clause is an element of the scheme to defraud." *Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 667 (2d Cir. 1997). Therefore, whether the agreement was fraudulently induced is an issue for the arbitrator to decide.

**C. The Delegation Clause Requires that the Validity of the Arbitration Clause be Determined by the Arbitrator**

The Court must next determine whether the dispute over arbitrability is within the scope of the Arbitration Clause. *American Express Financial Advisors*, 672 F.3d at 128. TFD argues that the parties agreed to delegate authority over the question of arbitrability to an arbitrator. Doc. 27 at 15–16. Trott argues that the delegation clause should not be enforced because there was no mutual assent between the parties. *See* Doc. 29 at 14.

The FAA "requires that [the court] interpret the [arbitration] contract as written. When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63,

68 (2019). Courts will enforce delegation clauses that "clearly and unmistakably" delegate authority over the issue of arbitrability to an arbitrator. *Gingras v. Think Finance, Inc.*, 922 F.3d 112, 126 (2d Cir. 2019). Section 13.2 of TFD's Terms states that "any and all claims, disputes, or controversies . . . as well as any dispute concerning the validity, enforceability, or scope of this agreement to arbitrate [] shall be resolved exclusively through final, binding, and individual arbitration, and not in a court of law." Doc. 28-2 at 21. These Terms delegate exclusive authority over determining scope and validity of the arbitration agreement to an arbitrator. In *Rent-A-Center*, the Supreme Court upheld a delegation clause in an arbitration agreement between a former employee and employer which delegated the issue of arbitrability to an arbitrator. 561 U.S. at 71. The delegation clause in *Rent-A-Center* stated "[t]he Arbitrator . . . shall have exclusive authority to resolve any dispute relating to the . . . enforceability . . . of this Agreement." *Id.* at 66. TFD's Terms similarly note that "[t]he parties agree that . . . any dispute concerning the validity, enforceability, or scope of this agreement to arbitrate [] shall be resolved *exclusively* through final, binding, and individual arbitration" (emphasis added). Doc. 28-2 at 21. These Terms clearly and unmistakably delegate exclusive authority over determining scope and validity of the arbitration agreement to an arbitrator.

**D. The Arbitration Clause is not Unconscionable**

Trott also argues that the Arbitration Clause should be invalidated for unconscionability. Doc. 29 at 17–18. TFD argues that Trott alleges no facts nor cites any case law that supports a finding of unconscionability. Doc. 30 at 13–14. "Like other contracts, [arbitration agreements] may be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" *Rent-A-Center*, 561 U.S. at 68 (quoting *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). Although, as discussed above, the Court may not rule on whether the entire agreement was fraudulently induced, "[i]f a party challenges the validity . . . of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that

agreement." *Id.* at 71. *See also Coinbase, Inc. v. Suski*, 602 U.S. 143, 151 (2024) ("Where a challenge applies 'equally' to the whole contract and to an arbitration or delegation provision, a court must address that challenge."). Therefore, the Court may properly consider whether the Arbitration Clause is invalid for unconscionability.

"[Q]uestions of contractual validity relating to the unconscionability of [an] arbitration agreement must be resolved first, as a matter of state law, before compelling arbitration pursuant to the FAA." *Ragone v. Atlantic Video at Manhattan Center*, 595 F.3d 115, 121 (2d Cir. 2010) (quoting *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 365 (2d Cir. 2003)). The Terms state that New York law shall govern in any matters involving state law. Doc. 28-2 at 23. Pursuant to New York law, "unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable." *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988). "A contract is unconscionable when it is 'so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms.'" *Ragone*, 595 F.3d at 121 (quoting *Gillman*, 73 N.Y.2d at 10).

*1. Procedural Unconscionability*

TFD's Arbitration Clause is not procedurally unconscionable. Procedural unconscionability "requires an examination of the contract formation process and the alleged lack of meaningful choice." *Gillman*, 73 N.Y.2d at 10–11; *Ragone*, 595 F.3d at 121–22. Here, Trott argues that the Arbitration Clause is procedurally unconscionable because it is contained in a contract of adhesion that is "intentionally obscured" from customers and its Terms were one-sided. Doc. 29 at 16, 17. A contract of adhesion:

> is a contract formed as a product of a gross inequality of bargaining power between parties. A court will find adhesion only when the party seeking to rescind the contract establishes that the other party used high pressure tactics, or deceptive language, or that the contract is unconscionable. Typical contracts of adhesion are standard-form contracts offered by large, economically powerful corporations to

> unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis, with no opportunity to change the contract's terms.

*JLM Industries, Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004) (quoting *Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir.1997)). However, Trott does not allege that TFD used high pressure tactics or that the language of the Arbitration Clause was deceptive. *See* Doc. 29 at 17.

A clause in a form contract is not invalid simply because it is not subject to negotiation. *See Carnival Cruise Lines v. Shute* 499 U.S. 585, 593 (1991) (upholding a forum selection clause contained in a form contract not subject to negotiation); *see also Ragone*, 595 F.3d at 122 (holding that an arbitration clause was not procedurally unconscionable because it was presented on a take it or leave it basis, and plaintiff did not read the agreement); *see also McDougall v. Samsung Electronics America, Inc.*, No. 23 Civ. 168 (LGS), 2023 WL 6445838, at *6 (S.D.N.Y. Oct. 3, 2023) (finding that the arbitration agreement contained in a contract of adhesion was not procedurally unconscionable). Accordingly, TFD's Arbitration Clause is not procedurally unconscionable.

2. *Substantive Unconscionability*

TFD's Arbitration Clause is also not substantively unconscionable. To assess substantive unconscionability, the Court will examine whether the "key terms are unreasonably favorable to one party." *American Family Life Assurance Co. of New York v. Baker*, 778 F. App'x 24, 27 (2d Cir. 2019) (citation omitted). "The 'principal purpose' of the FAA is to 'ensur[e] that private arbitration agreements are enforced according to their terms.'" *AT&T Mobility*, 563 U.S. at 344 (quoting *Volt,* 489 U.S. at 478). "[P]arties are generally free to structure their arbitration agreements as they see fit." *Volt*, 489 U.S. at 479.

Trott asserts that several aspects of the Arbitration Clause are substantively unconscionable, including: the requirement to engage in mandatory pre-filing dispute resolution; the requirement that arbitration take place in New York City pursuant to the

AAA's Rules; the prohibition on class consolidated actions; equal fee splitting between the parties; the prohibition on injunctive relief; the thirty-day arbitration opt out provision; the lack of temporal limitation of the Arbitration Clause; and the fact that the clause covers claims of fraud. Doc. 29 at 18. TFD asserts that unconscionability is a matter for the arbitrator to decide, but even if the Court were to rule on this issue, none of the provisions in the Arbitration Clause are unconscionable. Doc. 27 at 16.

**Mandatory pre-filing dispute resolution:** Trott argues that requiring the parties to engage in pre-filing settlement discussions unduly delays the action, especially where defendants are unwilling to settle the claims. Doc. 29 at 17. TFD asserts that courts have held that similar provisions are not unconscionable. Doc. 30 at 13. In *Whalen v. NBA Properties, Inc.*, this court declined to find that requiring a pre-filing dispute resolution process in an arbitration agreement between the parties was unconscionable pursuant to New York law, especially because the requirement applied equally to all parties. No. 25 Civ. 06125 (JAV), 2025 WL 3013144, at *2–3 (S.D.N.Y. Oct. 28, 2025); *see also McMahan v. Whaleco, Inc.*, No. 25 Civ. 1590 (MKB), 2026 WL 657449, at *19 (E.D.N.Y. Mar. 9, 2026) (holding that mandatory pre-filing dispute resolution requirements were not unconscionable under New York law). Like in *Whalen*, TFD's pre-filing dispute resolution applies equally to both parties. Doc. 28-2 at 21 ("Before either party may initiate a legal proceeding against the other, the parties agree to engage in a good-faith effort to resolve any [c]laim . . . at issue."). Thus, the Terms are not substantively unconscionable.

**Requiring arbitration in New York with the AAA:** Trott also argues that requiring the parties to arbitrate in New York City with the AAA is likely prohibitively expensive for most potential litigants. Doc. 29 at 17. TFD argues that this argument is unfounded because Trott filed the case in New York even though she lives in New Hampshire, so arbitrating in New York would not be unduly burdensome. Doc. 27 at 17. TFD also cites Second Circuit precedent establishing that an arbitration agreement is not

unconscionable just because it has an arbitral forum selection clause.[1] *Id.* (citing *Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975, 980 (2d Cir. 1996)).

"Where . . . a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 92 (2000). However, Trott does not specify how arbitration in New York would be any more expensive than litigating in New York federal court, where she has filed the instant case. *Molina v. Kaleo, Inc.*, 363 F. Supp. 3d 344, 351 (S.D.N.Y. 2019) (holding that requiring a plaintiff to arbitrate in a different state than their home state is not grounds to invalidate an arbitration clause for unconscionability where the plaintiff does not submit any evidence showing how arbitration will be cost prohibitive). Trott does not, for example, allege that filing and administrative fees associated with arbitration would be "so high as to make access to the forum impracticable." *American Express Co. v Italian Colors Restaurant*, 570 U.S. 228, 236. A party's financial hardship likewise is not grounds to invalidate an arbitral forum selection clause where no evidence is submitted showing that financial hardship is more than speculative. *Whitt v. Prosper Funding LLC*, No. 1:15 Civ. 136 (GHW), 2015 WL 4254062, at *7 (S.D.N.Y. July 14, 2015) (rejecting argument that arbitration agreement was unconscionable because plaintiff did not sustain his burden of showing arbitration was prohibitively expensive, even though he submitted evidence showing he was impoverished). Thus, the Terms are not substantively unconscionable because they require arbitration with the AAA in New York.

**Fee splitting:** Trott alleges that requiring each party to pay its own share of the fees is also unconscionable because arbitration may be more expensive than litigating the case in court. Doc 29 at 17. However, TFD points to cases where the court has upheld arbitration clauses with similar fee splitting provisions. Doc. 27 at 17–18. The risk of

[1] TFD does not argue whether potentially high arbitration costs make an agreement unconscionable. *See* Doc 27 at 16–17; Doc. 30 at 13.

incurring high costs through arbitration is not grounds for claiming substantive unconscionability where the contract was freely agreed to. *See American Family Life Assurance*, 778 F. App'x at 27 (holding that fee splitting provision of arbitration agreement was not unconscionable where party did not submit any evidence of financial inability to pursue arbitration). Also, the Second Circuit and this Court have upheld arbitration agreements that required the parties to split arbitration costs, noting that the parties could have investigated potential costs involved before proceeding with a lawsuit. *See, e.g.*, *Doctor's Associates, Inc. v. Hamilton*, 150 F.3d 157, 163 (2d Cir. 1998); *Molina*, 363 F.Supp.3d at 351. Thus, the Terms are not substantively unconscionable because they require the parties to split arbitration costs and fees.

**Prohibitions on class actions and consolidation:** Trott also argues that prohibiting class and collective actions will disfavor customers looking to file suit against TFD and will increase the litigation costs for individual plaintiffs. Doc. 29 at 17–18. TFD argues prohibiting class and collective actions is not unconscionable. Doc. 30 at 14. The Supreme Court has repeatedly upheld arbitration agreements containing class action waivers. *See AT&T Mobility*, 563 U.S. at 337–38, 352 (holding that the FAA preempted a California rule that said class action waivers in arbitration agreements were unconscionable); *see also Italian Colors Restaurant*, 570 U.S. at 233–34; *see also Epic Systems Corp. v. Lewis*, 584 U.S. 497, 508–09 (2018). "[C]lass-action waiver merely limits arbitration to the two contracting parties. It no more eliminates those parties' right to pursue their statutory remedy than did federal law before its adoption of the class action for legal relief in 1938." *Italian Colors Restaurant*, 570 U.S. at 236. The individualized nature of arbitration is one of its "fundamental attributes," and "attacking [] the individualized nature of the arbitration proceedings . . . [interferes] with" this. *Epic Systems*, 584 U.S. at 508. Thus, the Terms are not substantively unconscionable because they prohibit class and consolidated actions.

**Injunctive relief:** Trott asserts that the Arbitration Clause prohibits injunctive relief because an arbitrator lacks the authority to award relief to non-parties.[2] Doc. 29 at 18. However, the Terms do not prohibit injunctive relief. The Terms state:

> This agreement shall not, however, require arbitration of . . . (ii) requests for injunctive or other equitable relief . . . to prevent the actual or threatened infringement, misappropriation, or violation of a party's copyrights, trademarks, trade secrets, patents, or other intellectual property rights . . . . If a court decides that any part of this agreement to arbitrate is invalid or unenforceable because it would prevent the exercise of a non-waivable right to pursue public injunctive relief, then the parties agree that any dispute regarding entitlement to such relief (and only that relief) shall be severed from arbitration and may be litigated in court only after completion of arbitration.

Doc. 28-2 at 21, 23. Trott's claim that the Terms as written will make injunctive relief impossible are therefore unsupported.

**Thirty-day opt out window:** Trott also argues that only providing a thirty-day opt out window to the Arbitration Clause is unconscionable because TFD operates on a subscription model and customers continue to engage in transactions with them over time. Doc. 29 at 18. TFD argues that including an arbitration opt out provision *negates* a finding of unconscionability. Doc. 30 at 14; *see also Kai Peng v. Uber Technologies, Inc.*, 237 F. Supp. 3d 36, 55 (E.D.N.Y. 2017) (noting that where an arbitration clause has an opt-out window, "the consumer is not in a 'take it or leave it' position—rather the consumer could easily choose to [cancel the contract]" (citation omitted)). Courts applying New York law have found that arbitration agreements containing an opt-out provision "substantially negate[]" a finding of unconscionability. *Kai Peng v., Inc.*, 237 F. Supp. 3d at 55 (finding that an arbitration agreement with a 30-day opt-out provision was not unconscionable); *see also Tsadilas v. Providian National Bank*, 13 A.D.3d 190, 191 (1st Dep't 2004) ("[An] arbitration provision alone is not unconscionable because plaintiff had the opportunity to

---

[2] TFD did not respond to this argument in its reply. *See* Doc. 30.

opt out without any adverse consequences.”). Thus, the Terms are not substantively unconscionable because they contain a thirty-day opt out window.

**Temporal Scope:** Finally, since the Terms lack temporal limitation, Trott argues that customers are unable to make an informed decision about whether the Terms are fair because they apply to claims which may be “wholly unforeseeable” at the time of agreement. Doc. 29 at 18. TFD points to cases where the Second Circuit and this Court have upheld arbitration clauses with no temporal limitation. *See, e.g.*, *Arrigo v. Blue Fish Commodities, Inc.*, 408 F. App’x 480, 481–82 (2d Cir. 2011). This Court has also upheld arbitration clauses that lack temporal scope and found they apply to events that occurred before the agreement between the parties was created. *See Lai Chan*, 180 F. Supp. 3d at 241; *see also Nigel Isaacs v. GP Construction LLC*, No. 26 Civ. 2782 (AS), 2026 WL 2859856, at *2 (S.D.N.Y. Sep. 23, 2026). Thus, the Terms are not substantively unconscionable because they lack temporal limitation. These Terms delegate exclusive authority over determining scope and validity of the arbitration agreement to an arbitrator. Therefore, the Terms are not procedurally or substantively unconscionable, so any other issues are to be decided by an arbitrator.

## IV. CONCLUSION

For the reasons set forth above, TFD’s motion to compel arbitration is GRANTED. The Clerk of Court is respectfully directed to terminate the motion, Doc. 26, and stay the case. Parties are directed to submit a status update within 48 hours of the arbitration decision.

It is SO ORDERED.

Dated: November 20, 2026
New York, New York

EDGARDO RAMOS, U.S.D.J.